THE PEOPLE, *ex rel*. Robert H. Morris, *vs*. FRANCIS W. EDMONDS, chamberlain of the city of New-York, and treasurer of the city and county of New-York.

The act of the legislature, passed April 16, 1852, authorizing the board of supervisors of the county of New-York to raise by tax upon said county and to pay to the justices of the supreme court resident in the first district, such additional annual compensation as they may deem proper, was valid and constitutional.

And when the board of supervisors, in pursuance of said act, have fixed the amount to be paid to each of said justices annually, as an additional compensation, and have audited and allowed an account presented by a justice, for the compensation due to him, and directed the county treasurer to pay the amount thereof, it is the duty of such treasurer to pay the same ; and for his refusal a mandamus lies.

THIS was a motion for a mandamus, to compel the defendant to pay the amount of an account, which had been audited and allowed by the board of supervisors of the county of New-York, and directed to be paid by the defendant as county treasurer of the city and county of New-York. The facts are set forth in the opinion of the court.

S. B. STRONG, J. This case was argued at a special term, which I was required to hold in the city of New-York, by an order of the chief judge of the court of appeals. The duty thus devolved upon me is one of considerable delicacy, from the circumstances that the relator is himself a justice of this court;

and that the statute, under which he prefers his claim, also makes a similar provision for his associates residing in this district, and authorizes the payment of the expenses of their brethren from other parts of the state while discharging the duties of their office in this county. But the course adopted by the relator in this instance is neither unprecedented, nor, if he proceeds at all before a legal tribunal, unnecessary. Lord Ellenborough prosecuted his libeler before Judge Grose while both sat in the court of king's bench. Chief Justice Spencer brought several suits for libel in this court, while sitting here. (*Spencer* v. *Gould,* 2 *Caines,* 109 ; *Spencer* v. *Southwick,* 10 *John.* 259 ; *Spencer* v. *Tabele,* 9 *Id.* 314,) and Judge William W. Van Ness resorted to his own court for redress for a grievance, which drove that most amiable man from the bench, and probably shortened his existence. (19 *John.* 349.) In those cases there were other tribunals to which the plaintiffs might have applied for redress ; but, in the present instance, if the relator is entitled to the relief which he claims, he can obtain it only in the court of which he is one of the judges. A judge is precluded from acting in his official capacity "in any cause to which he is a party, or in which he is interested," (2 *R. S.* 275, § 2 ;) but the prohibition does not extend to cases where the interest is simply in some question of law involved in the controversy. The statute very properly stops short of that, as judges must often, and necessarily, consider and decide questions which may be applicable to their own rights, or to their property, should they be fortunate enough to possess any. Thus, the judges residing in this district, have an extensive interest in the pecuniary affairs of the city, yet they frequently decide cases of considerable magnitude in which the corporation is a party. In a case now pending, relative to a projected railroad in Broadway, one of those learned judges, who was a large proprietor of lots and buildings adjoining that street, read an able opinion, in which his associates concurred, asserting his right to hear and decide the cause. He declined acting in that case, simply because there were other judges present not at all interested in the questions involved, or the event of the suit, who

The People v. Edmonds.

could perform the duty. But in a subsequent case, relative to another railroad in the city, the same judge, having then an interest only in the questions, very properly took part in the decision. In the case of *The Mayor, &c. of the City of Albany* v. *Cunliff*, before the court of appeals, (2 *Comst.* 165,) where a considerable amount had been awarded against that city in the supreme court, Judge Bronson, who was then a corporator, gave an opinion and voted in favor of a reversal of the judgment. In *Stuart* v. *The Mechanics' and Farmers' Bank*, (19 *John.* 501,) the chancellor, who was a stockholder in the bank, after advising with Chief Justice Spencer, concluded to decide the cause. The reason assigned by those learned judges was, that the chancellor had the exclusive jurisdiction of the case. Upon the same principle, Chancellor Kent heard and decided a case in which his brother was a defendant, and another case in which his brother-in-law was the complainant; (*Mooers* v. *White*, 6 *John. Ch. R.* 360;) and Chancellor Walworth took cognizance of a cause where a bill in chancery had been filed against his brother as assistant register, but asking relief against him personally. (*In the matter of Leefe and wife*, 2 *Barb. Ch. R.* 39.) In that case the chancellor said, "The statute, it is true, prohibits any judge from sitting when he is related to either of the parties within the ninth degree of affinity or consanguinity, but it has not provided for any other person or tribunal to exercise the appellate power which is given to the chancellor by the constitution in such cases. The constitution must therefore control, as that is the paramount law." I know of no instance in which official association, or a possible interest in some question involved in the controversy, has prevented judicial action. If there had been any—indeed, if there had been a positive statutory prohibition—a judge of this court, upon whom general and unrestricted jurisdiction in law and equity has been conferred by the constitution, would nevertheless have been bound to hear and decide a cause, when the only objections to his acting would, if they could prevail, effectually bar the door of justice, which should be open to all against one of the parties.

The relator, on the 9th of May last, presented to the board of supervisors of the county of New-York an account for that part of the additional annual compensation to him, as a justice of the supreme court, resident in the first district, as allowed by an act of the legislature, passed on the 16th day of April, 1852, and the subsequent action of the supervisors under that law, accruing between the 1st of January and the 1st of April, 1853. The board of supervisors thereupon adopted a resolution in the following words :

" *Resolved*, That the preceding account [which was substantially as I have stated it] of Robert H. Morris be, and the same is hereby, audited and allowed, and that the chamberlain of the city of New-York, as county treasurer of the city and county of New-York, do accordingly pay to the said Robert H. Morris the amount thereof, that is to say, the sum of three hundred and seventy-five dollars, and a copy of this resolution shall be his sufficient warrant for such payment."

A copy of this resolution was presented to the defendant, and the money demanded, but he refused to pay it, on the ground that he was not authorized to make any payment out of the city treasury, except on a warrant drawn by the comptroller and countersigned by the mayor and clerk of the common council, according to the eleventh section of the act to amend the charter of the city of New-York, passed on the second April, 1849, (*Kent's City Charter and notes, p.* 186,) which had not been procured in this instance. The relator has applied for a mandamus, requiring the defendant, as the county treasurer, to pay the money. I am bound to award the desired process if I am satisfied that the claim is valid, that it has been made with the requisite formality, and that the relator has no other clear and adequate remedy.

It has been supposed that the act of the legislature, under and pursuant to which the allowance in question was made by the supervisors, was invalid ; because, first, it was prohibited by the constitution, and, secondly, it purported to sanction the imposition of a local tax for what should be a state expenditure. The constitution of this state provides, (*Article* 6, *sec.* 7,) that

the judges of the court of appeals, and justices of the supreme court shall severally receive, at stated times, for their services, a compensation to be establised by law, which shall not be increased or diminished during their continuance in office. By an act passed shortly after the adoption of the constitution, the justices of the supreme court were allowed an annual salary of twenty-five hundred dollars each. The act of the 16th of April, 1852, to which I have before alluded, provides that it shall be lawful for the board of supervisors of the county of New-York, to raise by tax upon said county, and pay to the justices of the supreme court, resident in the first district, such additional annual compensation as they may deem proper. (*Laws of* 1852, *p.* 592, § 7.) The board of supervisors of that county, on the 27th of December, 1852, resolved that in pursuance of the authority vested in them, there should be allowed to each of the justices of the supreme court, in the first judicial district, a compensation for their services of one thousand and five hundred dollars a year, which should be paid to them quarterly, out of the county treasury, in each year. The relator was elected a justice of this court last November, and his term of office commenced on the first day of January, 1853. The resolution of the board of supervisors had been passed previously to his accession to office, and his compensation was not thereby increased during his official term. In this respect his case differs from any which might be presented by either of his brethren, all of whom were elected before the year 1852. The only question under the constitutional provision, so far as it respects the relator, is, whether the additional compensation has been established by law. A general law can be enacted only by the state legislature; a special law, however, may be passed by the board of supervisors of a county, where the requisite power has been conferred upon it by the sovereign legislative authority. (*State Constitution, Art.* 3, § 17.) In the case under consideration, the power was expressly conferred. If the resolution of the board of supervisors has not all the attributes of a local law, it may yet be valid, as an exercise of the power conferred by the legislature. The constitution does

not require that the amount of compensation shall be specified in any general statute. It calls for legislative action. That is the required basis, but the superstructure may be fashioned pursuant to such provisions as may be established by the legislature. An act is as essentially accomplished by law when performed pursuant to a statute, as if consummated by the statute itself. The power of determining whether an expenditure shall be met by general or local taxation, is vested solely in the state legislature. It may not be without some restrictions; as I am unwilling to admit that there is any despotic power in any of our political institutions. It is, I conceive, beyond the power of the legislature to tax one man, or the inhabitants of one locality, exclusively for the benefit of another; but where an advantage is shared, more or less, by all, it is within the province of the legislature to determine whether the requisite expense shall be borne by the state at large, or only by a portion of it which may be peculiarly benefited. Thus, the expenses of laying out and improving highways, whether in the country or in our cities, although the improvement is to some extent beneficial to all, are assessed upon small districts, because the greater benefits are to those residing in the immediate vicinity. Our court houses are open to all litigants, and yet they are constructed by the county. In all such cases the action of the legislature is valid, unless the reason on which it is founded is clearly illusory. In the case of The People v. The Mayor, &c. of Brooklyn, recently decided by our court of appeals, Judge Ruggles, in his elaborate and very able opinion remarked, that "it must be conceded that the power of taxation, or of assigning to each individual his share of the burden, is vested exclusively in the legislature, unless this power is limited or restrained by some constitutional provision." Where a discretionary power is vested in the legislature it cannot be limited by the action of our courts. It is competent for them to pass upon the existence of the power, but not upon the propriety or expediency of its exercise. In the present instance the legislature has declared that the increased compensation to the justices of the first district may be paid by the county of New-

York. The reason undoubtedly is, that their necessary expenses exceed those of their brethren in other parts of the state. There is, too, a greater quantity of litigation in this court in the county of New-York, than in any other district. But the labor cannot be very different, as the requisite attention to the duties of any one of them, be his residence where it may, occupies all his business time, and often more, to the almost entire neglect of his private affairs. The greater expense attendant upon a residence in the city is, of course, from local causes, and must necessarily be incurred by all who constantly perform judicial labor there. That calls for additional remuneration, and is sufficient to legalize a local charge. A similar consideration, no doubt, induced the legislature of 1818 to pass an act giving to any justice of the supreme court who might reside in the city of New-York, in addition to his salary, fees for chamber business and for other services (out of court) appertaining to his office. (*Laws of that year, p.* 174.)

I have said that the case of Judge Morris differs in an important particular from any which might be presented by either of his associates. I do not, however, wish to be understood as intimating an opinion that the additional allowance to my other brethren in this district proposed by the resolution of the board of supervisors is unconstitutional. There has not, so far as I know, been any decision that public officers whose compensation for their services as established by law cannot be altered, are so far restricted to that, that they cannot receive any additional allowance for their expenses or any extraordinary service, when sanctioned by the legislature. The practice under the United States government, and in this state has been the other way. The constitution of the United States provides (*Art.* 2, § 7,) that the president shall at stated times receive for his services a compensation which shall neither be increased nor diminished during the period for which he shall have been elected, and he shall not receive within that period *any other emolument* from the United States, or any of them. Notwithstanding this provision, the president has uniformly had, in addition to his compensation, the gratuitous use of a dwelling house belonging to

the general government, and of the furniture which congress has from time to time provided. It cannot be supposed that congress would have tendered to the different presidents, or that those eminent would have accepted those "emoluments," if they had supposed that the practice was prohibited by the constitution which they had sworn to support. So, too, our state constitution contains a provision in reference to the compensation to the governor, precisely similar to that which is applied to the justices of this court. But the legislature almost invariably makes provision for the payment of the rent of the house occupied by the executive, and in the supply bill of 1852 appropriated $2,000 for that purpose. There are other similar instances under both the general and state governments, but I forbear to quote them, as it is unnecessary that I should express my opinion upon this point, nor do I intend to do so.

II. The objection upon which the counsel for the defendant mainly relied is, that the relator has not procured and presented to him a warrant for the amount claimed, drawn by the controller and countersigned by the mayor and clerk of the common council. As the money is clearly due, and confessedly in the treasury, and the objection is one of form rather than of substance, it should not defeat the present application for relief unless it is strongly sustained. The resolution of the board of supervisors declares that a copy of it shall be a sufficient warrant for the payment of the money. The revised statutes provide that the mayor, recorder and aldermen of the city of New-York shall be the supervisors of the city *and county* of New-York, and that all the provisions of the article relative to boards of supervisors *in each of the counties* in the state shall be construed to extend to them respectively, except when special provisions inconsistent therewith are or shall be, made by law *in relation to the city and county of New-York.* (1 *R. S.* 368, § 17.) Another provision in the next following article, relative to county treasurers, declares that the chamberlain of the city and county of New-York shall be considered the county treasurer thereof, and that all the provisions of that article shall be construed to apply to him, except when special provisions incon-

The People v. Edmonds.

sistent therewith, are, or shall be made by law in relation to the city and county of New-York. The board of supervisors is authorized to examine, settle, and *allow* all accounts chargeable against the county; (1 *R. S.* 367, *subd.* 2,) and it is made the duty of the county treasurer to pay and apply the moneys received by him in the manner required by law. (1 *R. S.* 369, § 20.) The act of April 16, 1852, (§§ 6, 7,) confers the power to increase the remuneration of the justices of this court, in the first district, upon the board of supervisors of the *county* of New-York, and *they* are directed to pay it by a tax to be raised *upon the county*. The resolution of the board relative to such additional remuneration, provides that it shall be paid out of the *county treasury*. The duties for which compensation is to be made, have no peculiar reference to the city as a corporation, but are such as are performed for all the counties of the state. All these considerations are strong to show that the charge in question is upon the *county*, rather than upon the city and corporation. If so, the resolution of the county board of supervisors was sufficient warrant for the payment of the money, unless there is some special provision to the contrary in the laws of the state, relative to the supervisors or treasurer of the city and county of New-York. Now the provision in the act to amend the city charter, passed on the second of April, 1849, (§ 11,) to which I have been referred, as requiring the controller's warrant, applies in terms to the treasury of the city. Nothing is said of the *county* treasury. It is not an enactment relative to the treasurer of the city and county, and so far as relates to the county, does not control or in any manner affect the powers conferred or duties devolved upon him by the revised statutes. The common council when it adopted the ordinance, organizing the departments of the municipal government of the city, approved on the 17th of May, 1850, evidently acted on the supposition that the provision in the act of the 2d of April, 1849, had reference only to the city treasury and to city claims, as it directs (in § 94) that no warrant shall be drawn (by the comptroller on the chamberlain) unless the sum specified therein is embraced *in an appro-*

*priation previously made for that purpose by the common council.* This provision is proper, so far as it relates to accounts against the city corporation, but is altogether inappropriate to county charges, over which the common council can have no legal control. The act of April 16th, 1852, delegates no power whatever to that body in reference to the additional compensation to the judges of this court, and surely a corporation has no power *upon a new matter*, except such as is expressly conferred. The territory, and the inhabitants of the city and county, are identical, and that, together with unity of action and identity of rights in many important particulars, has led to the supposition that the city as specially incorporated is to all intents the county. But that is not so. The same individuals may and often do constitute different corporations or bodies having separate and distinct powers and capacities; and subject to different rules of action. A city may be territorially a part of a county, or an entire county, or consist of parts of several counties. In all cases a distinct county organization exists unless a city receives a charter constituting it a county as well as a city. New-York has never been specially incorporated as a county. Governor Dongan's charter recites that there had been grants to the citizens and inhabitants of the city, sometimes by the name of Schout, Burgomasters, and Sthephens of the *city* of New Amsterdam, and sometimes by the name of the mayor, aldermen and commonalty of the city of New-York, and sometimes under other denominations, but, in all the instances specified, as a city, and it declares and grants that the mayor, aldermen and commonalty of the said city, and their successors should forever thereafter be and remain one body corporate and politic in deed, fact and name, by the name of the mayor, aldermen and commonalty of the city of New-York. Governor Montgomerie confirmed the charter to the city under the same corporate designation. The statute amending the charter, passed on the 7th of April, 1830, and on the 2d of April, 1849, are each entitled "An act to amend the charter of the *city* of New-York." Neither in the charters nor amendatory statutes is the corporation created a county, nor

is there a general delegation of the powers, rights, or responsibilities of a county. Manhattan island, with the adjacent islands, was constituted a county by a law of the first legislature ever held in the colony of New-York, on the first of November, 1683. It has been designated as a county in all the subsequent acts dividing this state into counties. It takes its organization as a county under the general laws of the colony and of the state, and not under its charter as a city. The inhabitants, in effect, constitute two corporations—one as a county, under the general laws of the state, (1 R. L. 364, § 1,) and the other as a city, under their charter. The chamberlain is specially declared by statute to be an officer of each, and is subject to different rules when acting in his several capacities. As the city treasurer, he acts under the charter as amended: and as county treasurer, under the laws of the state relative to such officers, except when they conflict with the charter. The statutes which in effect require him to pay county charges upon the order of the county supervisors, are not at all in conflict with the direction in the charter that he shall pay money out of the city treasury on the warrant of the controller, countersigned by the mayor and clerk of the common council. There would be an incongruity in allowing a mere city officer to have any control over the payments for county purposes. The controller is nowhere declared to be a county officer, nor has he under the statute any right to interfere with the fiscal concerns of the county, or with the conduct of those to whom the management of such concerns is confided by law. Neither is the clerk of the common council a county officer. Although the chamberlain holds the moneys paid to him in two different capacities, there is not, as he apprehends, any necessity that he should separate them into two distinct funds, or that he should keep two separate accounts of his disbursements. The appropriate requisitions upon him may vary, but that would subject him to no greater inconvenience than what is experienced by county treasurers generally in paying the state tax, the school moneys, and the county charges. Different requisitions are made upon the treasurers in each case, but the whole is included in the general account.

There may be some difficulty in distinguishing between city and county charges; but if so, the remedy can be applied only by the legislature. The defendant's counsel relied upon the facts that the moneys raised for both city and county purposes were included in one tax, that the assessors and collectors were the same, and that the funds were deposited with the same person, to show there was but one treasury, and that, therefore, a provision relative to payments from the city treasury applied to the whole. There is the same identity in the tax, in the officers by whom it is imposed and collected, and in the depository. In all the counties in the state, and in the counties other than New-York, the treasurer has but one office; and yet the moneys are held by the county treasurers for different purposes—for the state, for our public schools, and for county expenses—and in each case the depository is subject to different rules. A law regulating the payment of county expenses would have no bearing upon his transactions with the school officers and the state authorities. A fortiori, a law regulating payments out of the city treasury in New-York, could have no effect upon disbursements from the county treasury. The principle is plain enough; the only difficulty is in the application, and that arises from the fact that the same individual holds a fund derived from the same sources, a part of it in one capacity, and the residue in another. Upon the whole, I am satisfied that the money demanded in this case is a county charge; that the city authorities, as such, and apart from the express delegation of power to some of them as county officers, have no right to interfere, either in imposing or paying it, and that the defendant is bound to pay it upon the order of the board of supervisors, who have the control of the fiscal affairs of the county.

III. It was not disputed by the counsel for the defendant on the argument, but that a mandamus would be an appropriate remedy, if the relator was entitled to the money on his presenting the order of the supervisors. It is so, because he has no other adequate redress. The claim does not create a debt against the county, which could be recovered in an ordinary action. The decisions of the supreme court, in the case of

Phœnix against the Mayor, &c. of New-York, and of the court of appeals, in Brady against the same defendants, as they have been explained to me, are conclusive to that effect. The act of 1852, and the consequent resolution of the board of supervisors, made it the duty of the county and of its fiscal officer to pay the money, and for the refusal to perform such duty a mandamus lies.

A peremptory mandamus must issue, but as the defendant has acted conscientiously, I shall not award costs against him.

[NEW-YORK SPECIAL TERM, July 9, 1853  *S. B. Strong*, Justice.]